The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning. The first case this morning is 07-1263, Gubb v. P&M Services. Mr. Demarest. Good morning. May it please the court. I have with me, your honors, today Mr. Carl Thomas, who is one of the shareholders and directors of P&M Services. There are several issues in this case that are alternative ways of looking at the same question. That is, who may recover lost profits in this case? Judge Cook, in his various rulings during the trial, essentially indicated that none of the parties that have been involved with this 024 patent may recover lost profits. We believe that there are several alternative arguments for this court that indicate that the current holder of the patents, P&M Services, may recover lost profits. This patent application originally arose out of the efforts of Mark Wallace, one of the owners and the current president of P&M Services. He assigned the patent application to a company then called Fiber Core Recycling Systems. At that point, there was a change in the corporate structure of fiber core recycling. This particular invention, which is a machine to convert rolls of paper for the paper and cleaning industries, was recognized to have a lot of value. One of the other companies in the industry approached Mr. Wallace about buying essentially what amounted to a half interest in the patent application for a million and a quarter dollars. There was a corporate transaction entered into at that point. Plaintiff's Exhibit 37 is the closing binder for that transaction, which has a number of facets. The patent application, as I said, was transferred to Fiber Core Recycling. The parties to that transaction agreed that all of the other existing assets of Fiber Core Recycling would be transferred out to another company, leaving only the patent application and Fiber Core Recycling. The parties then changed the name of Fiber Core Recycling to a company called Norco Fiber Core Holdings. Was there ever an assignment document filed with the patent office at that point in time? At that point in time, there was not, Your Honor. There was an assignment document filed subsequently, but there was not in 1997. Although, as I understand it, there's no requirement that a document be filed with the patent office. I think the documents clearly show what the parties intended and what they carried out at the time. Well, there's no requirement for an assignment to be filed with the patent office, but it certainly gives you the protection of a clear cut on your ownership. That's true, Your Honor. And I think everyone, I think, would agree here that if we could roll back the clock and if some of these things were documented a little differently, that perhaps the situation would be more clear cut and we wouldn't be in front of Your Honors today. However, I think the result is clear in a couple of respects. There are two things I'd like to point out and two things I'd like to focus on today. One is whether the patent application was actually transferred from Norco Fiber Core Holdings to Norco Fiber Core Inc., because Judge Cook found that it was not effectively transferred. The second issue I'd like to focus on this morning is the effect of the Qualified Chapter S subsidiary election. Now, the first issue is we have a patent application that's owned by Norco Fiber Core Holdings, and in the closing documents for the transaction in which the Norco shareholders became involved in the company, it's clear that the intent of the parties was to transfer the patent application to Norco Fiber Core Inc. There's a board resolution that was passed, signed by all of the directors of Norco Fiber Core Holdings, indicating that they're going to transfer the patent application to Norco Fiber Core Inc., the subsidiary, in exchange for all of the stock of Norco Fiber Core Inc. Now, it's also clear we have the stock certificate in the record that, in fact, Norco Fiber Core Holdings received the stock certificate from Norco Fiber Core Inc. What was the consideration for that transfer? The consideration for the transfer was the patent application. If it had not been transferred, there would have been no right of Norco Fiber Core Holdings to receive the stock of Norco Fiber Core Inc. In order to transfer a patent application, there does have to be some writing, but there's no particular form that's required. The writing can consist of a number of documents. So what we have here is a board resolution that says we are going to transfer it. We have a stock certificate coming back to the transferor, indicating that the transfer was made. We also have the undisputed testimony of Messrs. Wallace, Rosen, and Thomas at trial that, in fact, that transaction was carried out. We also have several subsequent actions of the parties, including the fact that the patent was actually issued to Norco Fiber Core Inc. as a signee, that there are subsequent foreign license agreements for the province of Quebec and a European license agreement in which the licensor was Norco Fiber Core Inc. We also have prior lawsuits between these parties in which the plaintiff was Norco Fiber Core Inc. So I think not only do we have documentation that the transfer was made, but we also have documentation and evidence indicating that certainly the parties understood that the patent application and subsequently the patent had been transferred to Norco Fiber Core Inc. Mr. Gough cites a couple of cases to support his position, which I think are clearly distinguishable. He first cites the Gaia case. In that case, two years before a patent infringement lawsuit was filed, the board of directors of one of the two companies passed a resolution saying we would like to transfer our stock to this other company in exchange for their patents. However, there was no evidence that the transferee agreed to that. There's no evidence that the transaction was ever carried out. In fact, significantly, the alleged transferor of the patent in that case subsequently filed documents with the bankruptcy court indicating that it still owned the patents. In this case, we have evidence of the transfer, approval by both parties, and no inconsistent actions such as existed in the Gaia case. The Arachnid case I think is also easier to distinguish. In that case, there was simply a consulting agreement. The consulting agreement said if any inventions arise out of this consulting relationship, then ownership of those will be assigned to the client. There wasn't any specific patent application on file at the time. It was simply a contractual agreement that if we invent something, then we will assign it. In this case, there was a specific patent application that was being assigned. Those numbers, huh? Well, that's an issue, Judge. We believe that it was. We believe that- It was assigned by what? The operation of the law? Well, Your Honor, we have a couple of different documents. We have a board resolution by the owner of the patent application that says we are transferring, we are going to transfer this patent application to our newly formed subsidiary in exchange for the stock. We then have the stock coming to the parent in exchange for that. There is documentation in the form of the board resolution and the stock certificate that that exchange took place. So basically, you're saying it was done by operation of the law. You're saying it was done by operation of the law, but that doesn't square with Gaia. In Gaia, there was an agreement, no assignment, and the board said there was an assignment sometime in the future. In Gaia- It was never undertaken. Well, Gaia is distinguishable for a couple of reasons, Your Honor. One is there was an approval by only one party to the transaction two years before the lawsuit was filed in Gaia. There's no evidence that there was a meeting of the minds. More importantly, in our case, the stock was actually transferred from the stock of Norco Fiber Core Inc. was in fact issued to Norco Fiber Core Holdings contemporaneously. It wasn't something that happened two years later. More importantly, in Gaia, Judge, the parties to the transactions themselves filed court pleadings in other cases. Well, there were two things that happened. The alleged transferor of the patent in Gaia was a company called Banstar. Two years after this transfer supposedly took place, Banstar filed a pleading bankruptcy court saying, We still own the patent. There was also a license agreement two years later in your N2 between Banstar and Gaia which indicated that Banstar still owned the patents. So what we have in Gaia is a situation where there's no evidence that the transaction of the transfer of the application or the patent actually took place two years earlier. Here we have evidence that it did. The evidence consists of the board resolution approving it. Counsel, does the board resolution ever even mention the patent? He actually says it's very clear it transfers the patent. I looked at the board resolution. The district court opinion in A6208 says it doesn't even mention the patent. It just says transfer of proprietary rights. Yes, Your Honor. In the first stock purchase agreement, the stock purchase agreement defines proprietary rights specifically to include patent application. Proprietary rights in the stock purchase agreement, section 6.8, defines proprietary rights to be all of the intellectual property of the company including specifically by application number the patent application. There's also the second issue, judges, that I'd like to address this morning. I think it's a very interesting issue which is the qualified subchapter S subsidiary. I think the starting point on that is the Dole case which is sort of traditional corporate law that a parent and a subsidiary have separate assets, they have separate liabilities, they have separate books, they have separate assets, they have separate income. However, in this case, we have what's called a qualified subchapter S subsidiary. Under the Internal Revenue Code, that's a very different type of entity. That's under the Internal Revenue Code. Right, counsel? And if there's no case, I'm aware of an extended subchapter S status to, for example, patent law or even assets other than income tax. Are you aware of any such cases? I think it is a question of first impression to this court. But I think the question, if you look at all of the case law on lost profits, the ultimate question really boils down to who lost the profits? Who lost the profits? Well, it's not who lost the profits, it's who lost the profits and did that person have standing to even be involved in the loss? Correct, Your Honor. But I think if you look at not only the Internal Revenue Code but the tax returns here, under the code, the qualified subchapter S subsidiary shall not be treated as a separate corporation. And all of the income and the assets... Income tax. I'm sorry. Please go right ahead. The sub S is a collection to be taxed differently than your C corporation. And it has nothing else to do with respect to ownership of the assets or otherwise. Even if they were traditional... Shareholders. Shareholders in the sub S are treated like partners, so the flow through is directed to the shareholders. For a traditional S corporation, I would agree, Your Honor. Because until a few years ago, a corporation could not have a subchapter S subsidiary. There are only individuals who are elected to be taxed as partners. However, it's clear from the code that there is a very different type of animal with the qualified subchapter S. It's not simply that the tax flows through tax flows through to the parent. But what it actually indicates is that it's not a separate entity. Now, maybe it is for certain other legal purposes, but for financial purposes. Is federal tax law capable of defining corporate entity status? I would assume that was a matter for state law. Outside of the tax consequences, is the Internal Revenue Code capable of defining corporate status? I believe that for this purpose it is, Your Honor. For this purpose? For income tax purpose. No, I think also for the question of standing to sue for lost profits. Because there are a couple... So, let me get this right. The Internal Revenue Code now governs state corporate allocations as well as federal tax law? What I'm saying, Your Honor, is that a qualified subchapter S subsidiary is a very unique relationship. A normal S corporation files its own tax return. An 1120-S. You're talking about a national subchapter? Yes, I'm trying to, Your Honor. I believe that because of the unique nature of the subchapter S subsidiary, that it is different. A subchapter S, which is owned by individuals, files its own tax return. A qualified subchapter S subsidiary does not file a separate tax return. We filed a notice with the IRS indicating that this entity was effectively dissolved. There was one tax return which showed all of the income from the use of this patent, all of the profits from the use of this patent, are on the tax return of the parent. Now, so if the ultimate question really is who lost the profits, which I think is the question. Your time has run out. We'll give you a little bit more. You've used up your time as well. I'm sorry, Your Honor. We'll give you a little more next. It showed you a 23-second time. Well, I believe it started at 12 minutes. All right. Thank you, Your Honor. Thank you, Your Honor. We'll give you a couple minutes more. Thank you. I appreciate it. Good morning. My name is Mark Morelli from Brooks-Cushman representing the appellee, Mark Gubb. One of the first things that appellant's counsel stated is that down below, Judge Cook held that none of the parties made or covered lost profits. He didn't hold that. He held that holdings may, because they own the patent, nobody else may. They didn't actually compete so that ultimately the lost profits would be awarded, is that right? Right. Well, that wasn't disputed, Your Honor, is my point. Mr. Dunbar's... Counsel, why would you object to jurisdiction in this case before we jump onto the merits? I think that was a... It's an issue that was our fault. We should have had something in the order and we think that it should be corrected or fixed. I don't think it really makes that much of a difference because the intent was that it was done final coming here. But looking back at the order, the order should have had something in there. That was the reason. But you objected to jurisdiction in this case. Do you think that jurisdiction is not presented? If we don't have jurisdiction, we don't have jurisdiction. So you think we don't have that? I read the papers that And then you responded to them. Did you file a response? We did. Well, on the same day we filed, we were directly both defined on the same day. And I agree with what they said with regards to intent. It was always our intent that the final judgment would have been final. We needed to put a statement in there about the 766 invalidity and unenforceability and we didn't put that in. But is the absence of that statement deprived of support of jurisdiction? I don't believe so, given the intent and given at least the agreement as to how things proceeded. I would hope that it doesn't deprive the court of jurisdiction because we could just get this entire matter done today. But it was an oversight. That statement should have been in there. But you made the statement in your response to the order show cause of death but reasonable support by the school district. Do you disagree with that statement, Your Honor? I would like to disagree with that statement, Your Honor. And the reason being is there was always the as Mr. Demarest had made clear in his papers the intent was that this was final. We just didn't have that statement in the final order which should have happened. That statement that you're reading is based on the fact that there wasn't the final order did not address the 766 invalidity or unenforceability. This is a statement taken from your response to our order show cause that after reviewing the pleadings Doug agrees that this court not jurisdiction, period. That was based on strictly, Your Honor a review of the pleadings and our acknowledgement of our mistake that it should have been in the final judgment. Do you believe that we have jurisdiction not in the final judgment? I do, Your Honor. There is a final judgment? Yes. Was that dismissal of the 766 contingent upon the finding that the French Federal Jury was glad that it was a court? I believe as we go back and look at how it all proceeded I believe it is. I believe that the proper dismissal in the final order would have been without prejudice because the court and the jury did not need to address those issues. How do you know that it was a court judgment? I would hope that there would be an agreement with my brother counsel on that. Based on how it proceeded the 024, the 766 patent were in the trial up until the J-Mon. And at that point it was agreed that because the 766 patent was found not to infringe. Does it make any difference as to whether it was without prejudice or with prejudice or on jurisdiction? I don't think it does for your jurisdictional purposes, Your Honor. So what should we do? One way or the other? Well, obviously I'm going to say I'm going to say without prejudice but I don't think I don't think the 766 patent has anything really any value in this case because when it issued it issued in September of 2001 my client had three saws that were accused of infringement. They were all built and one of them had already been sold by that date. Six months later my client disassembled the saws he had already had and also repurchased the one he had sold before the 766 patent issued and disassembled that as well. I don't think there's any damages, issues or anything along those lines that would change this case based on the 766 patent. So the 766 patent is out of the picture, do you think? I believe so, Your Honor. If we agree with the District Court Judge paying the house for application? Yes. I'd like to go back and touch on a couple of points on this board resolution. Obviously with our briefs we think that the Guyna case handles this on point. It was a board resolution and actually it was meeting minutes is what the testimony came in. It was meeting minutes and they wanted to assign it. It was never done for whatever reason. We don't know. They know what assignments are. They know what's required. It was never done. Mr. Demers points to a number of other pieces of evidence that indicate that there was a license or I'm sorry assignment. Why doesn't the transfer occur by operations law? Corporation A owns a patent from Corporation B and B takes as a surviving corporation doesn't she just take over all of the interest and value of Corporation A by operations law? I believe there'd be a written assignment of all assets and liabilities in that type of merger. There might be but not necessarily. If there was not What does an assignment do with the patent office? I'm sorry? What does the patent office have for an assignment to do? What does it do? The patent office  that was signed in 1999 well after that's 16 months after this these corporate documents actually over about two years from the original patent assignment and it was assigned from the inventor to Norcal Fiber Corp. A. The problem with that is that the inventor two years earlier already assigned it to Norcal Fiber Corp. Holdings. It was actually called Norcal Fiber Corp. Recycling Systems or excuse me Fiber Corp. Recycling Systems and then that's a name change. But who could object to that? Pardon me? Who could object to that transfer? Who could object to that transfer? What third party would object to that transfer? Third party perhaps the shareholders of whatever entity. But they did not. They did not. Because I understand that the inventor assigned the patent after the corporation already had ownership of the patent. Yes. Right? Yes. So there was no ownership of the inventor assigned over to the third party. Correct. If in fact that assignment was then registered with the patent office that's notification to the entire world that the party who is being tasked by me is the owner of the patent. Right? Yes. Now what ownership rights does that inventor have to transfer over at that point in time? At the time of the assignment he had no rights. And who could object to that transfer at that point? The third party objected? Who would have standing to challenge that assignment? The original entity which was 504 Recycling Systems Inc. Which is a company that's was owned by the inventor would have standing to object to that. What would they have? They didn't obviously. But they would not object to it. Wouldn't anyone who the patent is being asserted against have standing to challenge the liability of the subsequent assignment? Absolutely, Your Honor. And that's where this came in in this case. On page 9 of our brief we reproduced an interrogatory answer that was verified before this case went to trial in trying to understand who owned the patent. They told us that for the 024 patent North Pole Fire Corp. Inc. owned it because of that 1999 assignment which now they claim is no longer effective. They agree it's no longer effective or valid. But the 766 patent they say the earlier assignment assigned it to the Holdings Company. 766 patent is not even involved in the litigation. It's not, Your Honor. But I think it's illustrative of the fact that here they say in 1997 the Holdings Company had it. They don't mention that any of these corporate documents in 1998 transferred it to Inc. Nowhere in their interrogatory answer. The argument that they presented here today was born out of halfway through trial trying to figure out who really owned this patent and how they can argue to get lost profits for all these other entities that are not patentees under the statute. Going back to your original question about operation of law and transfer. Obviously the court is aware that the statute requires an instrument in writing that transfers assignments and patent applications. And there was no such document. As a statutory requirement I would think that operation of law would have to have some reference to an actual assignment in order for it to occur. With the application itself shown as being assigned was the assignment changed in the crime office at that point? There was no change in the crime office showing the true assignment at that point? Right. They had not submitted the original assignment. I think that that patent and that second assignment that was not effective is where all of these arguments regarding subsequent evidence fall in. For example, the prior lawsuit was based on what the face of the document said. The foreign license agreement was based on the face of the document. Just because it says it on the face of the document, we as a defendant investigated this prior to the trial and now all of a sudden, now it's a different position. Now it's, oh, well, there's these other documents in 1998 that really assigned this to me and there's board of meeting minutes, but as Judge Cook looked at the evidence and looked through everything that they asked him to look at, whether any of this indicated an assignment, he decided, well, we've already discussed the Gaia case and the Grantham case talked about the Gaia case in particular. Meeting minutes with an intent to assign something is insufficient. And then we go through trial and then we start going through trial and then they start putting in their damages position and their first position is that PNM Services, we haven't talked about them at all today, it's a totally separate company during the time of the infringement, but they were arguing that they're entitled to their lost profits. And the judge, right when that evidence was put in, said, well, how can you be entitled to some other company's lost profits? And they said, well, they're an exclusive licensee, the judge looked through the evidence that I don't see any evidence of that in the record, so I'm not going to let you present evidence of lost profits to PNM Services. They tried this with other companies too. There's a company called PCDC, which was a totally separate company, that they tried to claim they should be entitled to their lost profits. This was a series of events. We got through, I believe it was the third or fourth day of their presentation, and we had the issue of holdings versus handling. And there the judge said, well, I want bench memorandums before I make this decision. And we looked at the closing documents, looked at everything that Mr. Demers asked him to look at. He looked at the stock certificate, and he held that it didn't transfer ownership. And obviously that review, as far as ownership goes, is de novo. Another review is the evidentiary exclusion of the evidence related to lost profits by these other parties. I'm sure the stock certificate did not show any kind of ownership, except the ownership in the corporation. That's correct, Your Honor. In the stock certificate, there was only consideration for the stock certificate. It was, Your Honor, but there was no evidence of that transfer, as there was no evidence of the patent assignment. Was there any evidence of an exclusive license at all anywhere in the record? Mr. Demers obviously claims there was. It was presented to Judge Hogan. In fact, during trial and during deposition, we asked their owner, have you ever licensed these patents to anybody else? The answer was absolutely no. So obviously there are positions now that they're taking that look, if there was a patent  and      if there was a patent assignment, it was not licensed. It was never licensed. It was never licensed. It was never     licensed. It was never licensed. In fact, the first subsidiary was a company formed in Illinois. The Holdings Company was a Michigan company. They were totally separate for every other  I can't explain why they did it. They set up their structure for a reason and should not be able to get the benefits of lost profits of the subsidiary without taking the burdens associated with it. It was a very difficult situation for the company to address. It was a very